**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**OCT 21 1997**

**PATRICK FISHER**
**Clerk**

PUBLISH

UNITED STATES COURT OF APPEALS

TENTH CIRCUIT

---

UNITED STATES OF AMERICA,

    Plaintiff-Appellee,

        v.

LEWIS A. LARSEN, a/k/a Louis A.
Larsen, a/k/a Jeffrey L. Larsen, a/k/a
Jeff Larsen, a/k/a Leland L. Larsen,

    Defendant-Appellant.

No. 96-3284

---

Appeal from United States District Court
for the District of Kansas
(D.C. No. 95-20055-01)

---

Michael L. Harris, Assistant Federal Public Defender, Kansas City, Kansas, for
the appellant.

Kurt J. Shernuk, Assistant United States Attorney (Jackie N. Williams, United
States Attorney, with him on the brief), Kansas City, Kansas, for the appellee.

---

Before BRORBY, BRISCOE, and MURPHY, Circuit Judges.

---

BRISCOE, Circuit Judge.

---

Lewis Larsen appeals the denial of his motion to suppress evidence. In denying the motion, the district court concluded that although the evidence was found as a result of an illegal search, it inevitably would have been discovered in a separate investigation independent of the illegal search. Larsen's sole issue on appeal is whether the inevitable discovery rule requires proof of a separate investigation *ongoing* at the time of the constitutional violation. We conclude it does not and affirm.

I.

On August 4, 1994, local law enforcement officers recovered a stolen trailer from Larsen's property. One of the officers noticed a vehicle on the property with no vehicle identification number (VIN) plate and applied for a search warrant the next day, August 5. A warrant was issued authorizing a search for vehicles with identification numbers removed, identification number plates that had been removed from vehicles, and vehicle titles.

In executing the warrant on August 5, officers seized three vehicles within the scope of the warrant, but also seized numerous items outside the scope of the warrant, including tools, videocassette recorders, exercise equipment, lawn mowers, furniture, blankets, a microwave oven, bank records, and credit cards. The officers seized these items solely because they thought they might be stolen.

Mike Weigel, a state trooper, assisted with the search. Later that day, he went to the Saline Valley Bank in Lincoln on personal business and, while he was there, he mentioned to Glenn Stegman, the bank's vice president, that he had just recovered stolen vehicles from Larsen's property. Stegman became concerned because the bank had loaned money to Larsen for a vehicle. Stegman checked the bank's records to determine the status of Larsen's loans and, on August 24, he sent a Report of Apparent Crime to the FDIC.

Meanwhile, local officers contacted William Pettijohn, a KBI Agent. Pettijohn reviewed the seized bank records and, suspecting Larsen had obtained loans through fraud, he subpoenaed records from several banks on August 8, 1994. Based on information obtained in the August 5 search, local officers also obtained a second search warrant on August 9, authorizing a search of Larsen's property.

Pettijohn contacted Scott Crabtree, an FBI Agent, on August 9 and Crabtree reviewed the records produced by the banks. As the FDIC routinely forwards Reports of Apparent Crime to the FBI, Stegman's report was forwarded to Crabtee. Based on the bank records and Stegman's report, Crabtree issued subpoenas and, in accordance with standard FBI procedures, began tracing Larsen's banking activities. This led to issuance of subpoenas by a grand jury and

discovery of the bank records on which Larsen's prosecution for federal bank fraud and money laundering was based.

Larsen moved to suppress all evidence seized in both searches and evidence discovered as a result of the searches, including the bank records subpoenaed by the grand jury. At the suppression hearing, Crabtree testified that Stegman's report would have been forwarded to him regardless of the other investigation and by itself would have caused him to undertake the same course of action to trace Larsen's funds. Applying United States v. Medlin, 842 F.2d 1194, 1199 (10th Cir. 1988), the district court concluded the August 5 search so exceeded the scope of the warrant that all evidence seized, including the vehicles within the scope of the warrant, must be suppressed. Because the August 9 search was the result of the August 5 search, the court also suppressed all evidence seized on August 9.

However, the district court applied the inevitable discovery doctrine adopted by the Supreme Court in Nix v. Williams, 467 U.S. 431 (1984), and by this court in United States v. Romero, 692 F.2d 699 (10th Cir. 1982). The court ruled the bank records found through Crabtree's tracing of Larsen's funds inevitably would have been discovered in the absence of any illegality. The court concluded that, because Weigel's remarks that caused Stegman to check the bank's records and write the report were not intended to exploit the illegal search, the report was sufficiently attenuated from the illegal search and the taint of illegality

-4-

was dissipated. The court also concluded that if the August 5 search had been limited to the scope of the warrant, the vehicles would have been lawfully seized, Weigel would have told Stegman of the seizure, Stegman would have written the report to the FDIC, and Crabtree would have traced Larsen's funds. Accordingly, the court denied suppression of the bank records discovered by Crabtree.

Larsen entered a conditional plea of guilty to one count of bank fraud, 18 U.S.C. § 1344, and one count of money laundering, 18 U.S.C. § 1957, and the remaining counts were dismissed.

## II.

Larsen contends the inevitable discovery rule requires proof of a separate investigation *ongoing* at the time of the constitutional violation. He points out that the bank investigation that the district court found would have led to discovery of the evidence of fraud did not commence until after the illegal August 5 search. Larsen relies on United States v. Terzado-Madruga, 897 F.2d 1099 (11th Cir. 1990), and United States v. Brookins, 614 F.2d 1037 (5th Cir. 1980), which state the inevitable discovery exception requires proof that when the illegality occurred, the police possessed and were actively pursuing leads that inevitably would have led to discovery of the challenged evidence. He argues we adopted this requirement in United States v. Griffin, 48 F.3d 1147 (10th Cir. 1995), and United States v. Owens, 782 F.2d 146 (10th Cir. 1986).

We do not agree with Larsen's interpretation of these cases. We conclude the inevitable discovery exception applies whenever an independent investigation inevitably would have led to discovery of the evidence, whether or not the investigation was ongoing at the time of the illegal police conduct.

Like the independent source doctrine, the inevitable discovery doctrine is an exception to the general rule requiring exclusion of evidence that is the result of unlawful government conduct. Evidence found as a result of illegal police conduct that inevitably would have been lawfully discovered absent the illegal conduct need not be suppressed. Nix, 467 U.S. at 440-44. The inevitable discovery doctrine is based on the same rationale as the independent source doctrine--that "the interest of society in deterring unlawful police conduct and the public interest in having juries receive all probative evidence of a crime are properly balanced by putting the police in the same, not a worse, position that they would have been if no police error or misconduct had occurred." Id. at 443. When the challenged evidence also has an independent source or would inevitably have been discovered by independent lawful means, exclusion of the evidence "would put the police in a worse position than they would have been in absent any error or violation." Id.

It is true that in Nix, the independent search the Court concluded inevitably would have led to discovery of the evidence was underway during the illegal

-6-

police conduct. The dissent described the majority opinion as holding the inevitable discovery exception applies when evidence inevitably would have been discovered "by an independent line of investigation that was already being pursued when the constitutional violation occurred." Id. at 457 (Brennan, J., dissenting). We quoted this language in Owens, and noted the unconstitutional search in a motel room "tainted the only police investigation that was ongoing." 782 F.2d at 152.

However, neither the majority opinion in Nix nor our cases limit the inevitable discovery exception to lines of investigation that were already underway. They require only that the investigation that inevitably would have led to the evidence be independent of the constitutional violation. Nix, 467 U.S. at 443; Griffin, 48 F.3d at 1150. In Owens, although we quoted the dissent's characterization of the majority's holding in Nix, we rejected the government's argument that routine cleaning by the motel staff inevitably would have disclosed the drugs found in an illegal police search, not because the routine cleaning was not yet underway but because discovery and reporting of the drugs by the staff was too speculative to be inevitable.

The fact that another investigation was already underway when a constitutional violation occurred is strong proof that it was independent of the illegal investigation, as Nix and Griffin illustrate. However, it is possible for an

investigation that begins after the violation to be independent of the illegal investigation. See, e.g., United States v. Kennedy, 61 F.3d 494, 499-500 (6th Cir. 1995); United States v. Thomas, 955 F.2d 207, 210 (4th Cir. 1992); United States v. Boatwright, 822 F.2d 862, 864 (9th Cir. 1987). Even the Fifth Circuit, which held in Brookins that the independent investigation must be ongoing at the time of the illegal conduct, later recognized the inevitable discovery exception also may apply when, for example, "the hypothetical independent source comes into being only after the misconduct." United States v. Cherry, 759 F.2d 1196, 1206 (5th Cir. 1985).

The district court properly applied the inevitable discovery doctrine in denying Larsen's motion to suppress, even though the investigation that inevitably would have led to discovery of the evidence began after the illegal conduct.

The order of the district court denying Larsen's motion to suppress is AFFIRMED.