**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**JUL 24 2002**

**PATRICK FISHER**
**Clerk**

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

---

UNITED STATES OF AMERICA,

Plaintiff - Appellee,

v.

FRANK SANDERS, JR.,

Defendant - Appellant.

No. 00-5215

(N.D. Oklahoma)

(D.C. No. 00-CR-31-C)

---

**ORDER AND JUDGMENT** *

---

Before **TACHA** , Chief Circuit Judge,   **BALDOCK**  and **HENRY** , Circuit Judges.

---

Frank Sanders, Jr. appeals his convictions for (1) violation of 26 U.S.C. §§ 5861(d), 5845, and 5871 (possession of an unregistered firearm – a sawed-off rifle) and (2) violation of 18 U.S.C. § 922(g)(3) (possession of a firearm – the sawed-off rifle and/ or one of several of other specified firearms – by an unlawful user of a controlled substance).  Mr. Sanders advances three contentions of error: (1) the district court erred in admitting, in violation of the Fourth Amendment's exclusionary rule, (a) evidence of the particular firearms, the possession of which

---

 *  This order and judgment is not binding precedent, except under the doctrines of res judicata, collateral estoppel, and law of the case.  The court generally disfavors the citation of orders and judgments; nevertheless, an order and judgment may be cited under the terms and conditions of 10th Cir. R. 36.3.

underlay both counts of which Mr. Sanders was convicted, (b) Mr. Sanders's statements in response to the discovery of one of those firearms, and (c) certain evidence of Mr. Sanders's drug use; (2) § 922(g)(3) is unconstitutionally vague, as applied to the facts of Mr. Sanders's case; and (3) the district court erred in improperly instructing the jury as to the § 922(g)(3) charge. Exercising jurisdiction pursuant to 28 U.S.C. § 1291, we affirm.

## I. BACKGROUND

On May 26, 1999, at least five police officers (Officers Scott, Shavney, Stephens, Tryon, and Eberle) arrived at Mr. Sanders's home to execute, on Mr. Sanders, an outstanding arrest warrant. Mr. Sanders's property included a trailer home and a quonset hut. Three men, one of whom was Mr. Sanders, emerged from the quonset hut and the police officers detained these gentlemen.

### A. The Contested Searches of Mr. Sanders's Trailer Home and Quonset Hut

Officers Scott, Shavney, Stephens, Tryon, and Eberle proceeded to conduct at least three distinct searches of Mr. Sanders's quonset hut. First, Officer Scott, soon after the emergence of the three detained gentlemen, entered the quonset hut in order to perform a 'protective sweep.' When Officer Scott reemerged, he reported having seen what he thought to be a methamphetamine lab. Officer

Scott, accompanied by other officers including Officer Shavney, subsequently reentered the quonset hut. While inside the quonset hut during this second search, Officer Shavney observed materials that he, too, associated with a methamphetamine lab.

After the initial two searches of the quonset hut, Officers Stephens and Tryon sought Mr. Sanders's consent to search the quonset hut for a third time. Mr. Sanders signed a consent form authorizing "a complete search of my premises and/or vehicle as described, 11313 East 191st Street, Tulsa County, Oklahoma, and curtilage, with M[r]. Sanders, [sic] wife, Sue Sanders, present." Rec. supp. vol. I, at 117 (Tr. of Hr'g on Mot. to Suppress, dated Apr. 27, 2000; test. of Officer Stephens). Despite the fact that the consent form clearly required Ms. Sanders's presence before the initiation of any search, several police officers initiated, prior to Ms. Sanders's arrival, a thorough search of the quonset hut. During this third search, the police officers discovered a large number of items associated with the production of methamphetamine. The police officers also discovered a number of firearms, including a "sawed-off .22 rifle" with a "Gatling device on it." Id. at 26, 28 (Tr. of Hr'g on Mot. to Suppress, dated Apr. 27, 2000; test. of Officer Shavney).

When Officer Shavney, carrying the sawed-off rifle, emerged from the quonset hut, Mr. Sanders exclaimed, as recalled by Officer Shavney: "I'm going

to get screwed, or that's going to screw me, or something, but that kind of reaction." Id. at 28-29. Officer Eberle remembered Mr. Sanders's statement rather more colloquially: "I'm fucked now." Rec. vol. V, at 178-79 (trial test. of Officer Eberle). Officer Stephens testified that Mr. Sanders "made a statement that he had purchased [the 'Gatling device'] at a gun show . . ." Rec. supp. vol. I, at 116 (Tr. of Hr'g on Mot. to Suppress, dated Apr. 27, 2000; test. of Officer Stephens). These statements, taken together, strongly suggest Mr. Sanders's ownership of the sawed-off rifle.

A subsequent search of Mr. Sanders's trailer home revealed "drug paraphernalia, methamphetamine, [and] marijuana," Aplt's Br. at 8, as well as several additional firearms.

## B.    Other Evidence of Drug Use

In addition to the evidence of drug use (or at least possession) developed from the searches described above, Mr. Sanders tested positive for drug use and/ or admitted such use on a number of occasions before and after the May 26, 1999 search and arrest. On February 26, 1999, Officer Tryon discovered Mr. Sanders in possession of methamphetamine. On March 1, 1999, Mr. Sanders admitted using methamphetamine and marijuana two weeks prior to that date. On July 26, 1999, Mr. Sanders tested positive for the use of amphetamines and admitted some

-4-

use of drugs. On August 9, 1999, Mr. Sanders tested positive for marijuana. On September 13, 1999, Mr. Sanders tested positive for marijuana use and admitted such use. On October 18, 1999, Mr. Sanders tested positive for amphetamines and admitted using drugs on that occasion. On October 25, 1999, Mr. Sanders tested positive for the use of amphetamines, cocaine, and marijuana. On November 1, 1999, Mr. Sanders tested negative for drug use, but, on November 22, 1999, he again tested positive for amphetamine use. On May 2, 9, and 25, 2000, Mr. Sanders tested positive for methamphetamine and marijuana, among other drugs.

## C.    Indictment and Trial

The United States indicted Mr. Sanders on March 10, 2000, later issuing a superceding indictment on May 8, 2000. Mr. Sanders filed a motion to suppress all the evidence gathered in the May 26, 1999 search of his property, specifically including evidence of his statements made in response to the removal of the sawed-off rifle from the quonset hut. After conducting an evidentiary hearing, the district court confirmed that the May 26, 1999 searches were conducted without a search warrant. While the district court determined that the 'protective sweep' doctrine established the constitutionality of the first search of the quonset hut, the court explicitly questioned whether Mr. Sanders's consent was sufficient

to cleanse either the third search of the quonset hut or the search of the trailer home. Nonetheless, without ruling definitively on the legality of the latter two searches, the district court invoked the doctrine of inevitable discovery to overrule Mr. Sanders's motion to suppress.

Asserting that 18 U.S.C. § 922(g)(3) is unconstitutionally vague, Mr. Sanders also moved to dismiss the charged unlawful possession of a firearm by a user of a controlled substance. The court denied this motion, and Mr. Sanders submitted proposed jury instructions as to that charge. The district court ultimately instructed the jury – over Mr. Sanders's objection – that, in order to convict Mr. Sanders of violating § 922(g)(3), the jury had to find "that the defendant was an unlawful user of a controlled substance during the time period charged in Count 2 of the Information . . ." Aple's Br. at 50.[1] Also over Mr. Sanders's objection, the district court defined an 'unlawful user of a controlled substance' as "one who regularly, at reoccurring times, unlawfully uses a controlled substance." Id. The district court continued: "The government only need prove the defendant was an unlawful user of a controlled substance during the time he possesses firearms. The government need not prove the defendant actually illegally used a controlled substance at the same time he was in

---

[1] We are hesitant to merely cite to the government's brief to establish the actual jury instructions given at Mr. Sanders's trial. The parties, however, have neglected to designate the jury instructions for inclusion in the appellate record.

-6-

possession of the firearm." Id. at 51.

## II. DISCUSSION

### A. The Challenged Search

Mr. Sanders first challenges the district court's admission of the evidence obtained in the May 26, 1999 search of his trailer home and quonset hut. This evidence consists of: (1) physical evidence, including the sawed-off rifle, other firearms, and various forms of drug paraphernalia and (2) Mr. Sanders's statements in response to the discovery of the sawed-off rifle. The government acknowledges both obtaining the challenged evidence via an illegal search of Mr. Sanders's property and the fact that, ordinarily, such a violation of Mr. Sanders's rights would render the given evidence inadmissible. The government does argue, however, that the district court correctly applied the doctrine of inevitable discovery to salvage the admissibility of both the physical evidence and Mr. Sanders's statements. Mr. Sanders, on the other hand, counters that the inevitable discovery doctrine is not properly applicable to either type of challenged evidence.

We consider, in turn, the admissibility of the physical evidence and the admissibility of Mr. Sanders's statements. In so doing, we review the ultimate Fourth Amendment issues de novo; we review any relevant district court factual

determinations, however, only for clear error.  See United States v. Souza, 223 F.3d 1197, 1201 (10th Cir. 2000) ("Although we review the ultimate Fourth Amendment question de novo, the district court's factual determinations are reviewed only for clear error.").

### 1.     Admissibility of the Physical Evidence

Regarding the applicability of the inevitable discovery doctrine to the admissibility of the relevant firearms and the evidence of Mr. Sanders's drug use, Mr. Sanders argues that we may not apply the inevitable discovery doctrine unless, at the time of the illegal search, the government had already initiated the alternative investigation by which the government would have inevitably discovered the challenged evidence.  Our decision in a case that Mr. Sanders fails to discuss – United States v. Larsen, 127 F.3d 984 (10th Cir. 1997) –, however, expressly rejects this position.

In Larsen, the police, suspecting that Mr. Larsen was dealing in stolen cars, illegally searched Mr. Larsen's home.  During the search, the police discovered evidence confirming Mr. Larsen's illegal conduct.  Given the illegal search, a judge suppressed the discovered evidence, effectively destroying the prosecutor's case.  The local police contacted the Federal Bureau of Investigation (the "FBI"), passing to the FBI evidence obtained in the illegal search.  Simultaneously, the FBI received a second tip suggesting the need to investigate Mr. Larsen.  The

second tip arose when a police officer who participated in the illegal search happened to mention, to a local banker, the police suspicion regarding Mr. Larsen's title to certain vehicles. Fearing that Mr. Larsen may have defrauded the bank in securing loans based upon those car titles, the banker followed routine procedure in filing a report with the Federal Deposit Insurance Corporation (the "FDIC"); the FDIC, in turn, followed routine procedure in notifying the FBI. The FBI, in possession of two tips suggesting an investigation of Mr. Larsen, did so, eventually bringing charges against Mr. Larsen. Mr. Larsen moved to suppress the evidence gathered by the FBI as a fruit of the illegal search (absent the illegal search, the FBI would never have been led to investigate Mr. Larsen).

We salvaged the admissibility of the FBI's evidence by invoking the inevitable discovery doctrine. The Larsen panel indicated that, insofar as the FBI investigation depended upon the first tip (from the local police), the FBI investigation was the fruit of the illegal search, thus leaving the FBI's evidence inadmissable. The panel continued, however, by further indicating that the second FBI tip (via the banker and FDIC) was not fruit of the poisonous tree because the suspicion of the local police (communicated to the banker) predated the illegal search. Since the record contained evidence that the FBI would have investigated based upon the second tip alone, the panel affirmed the district court's application of the inevitable discovery doctrine: the FBI would inevitably

have discovered Mr. Larsen's bank fraud and money laundering via an independent, legal means.

For the Larsen panel, the fact that the FBI investigation (the lawful means of discovering the evidence) was not ongoing at the time of the illegal search was not controlling. The inevitable discovery doctrine does not necessarily require that the separate, lawful means of obtaining the challenged evidence be "already underway"; rather, the doctrine requires "only that the investigation that inevitably would have led to the evidence be independent of the constitutional violation." Larsen, 127 F.3d at 987. The panel further explained: "The fact that another investigation was already underway when a constitutional violation occurred is strong proof that [the alternative investigation] was independent of the illegal investigation . . . . However, it is possible for an investigation that begins after the violation to be independent of the illegal investigation." Id.

In Larsen, then, we squarely rejected Mr. Sanders's contention: "We conclude [that] the inevitable discovery exception applies whenever an independent investigation inevitably would have led to discovery of the evidence, whether or not the investigation was ongoing at the time of the illegal police conduct." Id. at 986 (emphasis added); see also 3 CHARLES ALAN WRIGHT, FEDERAL PRACTICE AND PROCEDURE § 677, at 375 n.14.1 (2d ed. Supp. 2002) (citing Larsen for the proposition just quoted); STEPHEN E. HESSLER,

ESTABLISHING INEVITABILITY WITHOUT ACTIVE PURSUIT: DEFINING THE INEVITABLE DISCOVERY DOCTRINE EXCEPTION TO THE FOURTH AMENDMENT EXCLUSIONARY RULE, 99 MICH. L. REV. 238 (2000) (arguing against rigid application of an active pursuit element of the inevitable discovery doctrine). Applying Larsen to Mr. Sanders's case dictates admission, via the inevitable discovery doctrine, of the physical evidence discovered during the May 26, 1999 search of Mr. Sanders's property.[2]

### 2.    Admissibility of Mr. Sanders's Statements

We next consider the district court's failure to suppress Mr. Sanders's statements suggesting his ownership of the sawed-off rifle.  Here we assume, though without deciding, both that (1) Mr. Sanders's statements are suppressible as the product of the illegal search of his quonset hut and (2) that the inevitable discovery doctrine does not apply to those statements, see, e.g., United States v.

---

[2]  While Mr. Sanders does not raise this point, we have, in a case post-dating Larsen, referred to "steps taken to obtain a warrant prior to the unlawful search" as "prerequisite" to application of the inevitable discovery doctrine. Souza, 223 F.3d at 1205.  The 'prerequisite' description, however, constitutes dicta – and probably inadvertent dicta at that – in an opinion that, in another part, explicitly acknowledges, without challenging, the holding of Larsen. See id. at 1203 n.7 ("Larsen focused solely on whether the inevitable discovery rule requires proof of a separate investigation ongoing at the time of the constitutional violation.").  In any case, we are bound by our holding in Larsen until that holding is called into question by Supreme Court precedent or reviewed by our court en banc.  See Haynes v. Williams, 88 F.3d 898, 900 & n.4 (10th Cir. 1996) ("[W]hen faced with an intra-circuit conflict, a panel should follow earlier, settled precedent over a subsequent deviation therefrom.").

Vasquez De Reyes, 149 F.3d 192, 195-96 (3d Cir. 1998).  Having assumed error in the admission of the contested statements, we hold that error harmless.

The government, during briefing, neglected to raise the prospect of harmless error.[3]  This failure requires us to pause to consider whether we remain free to raise that issue sua sponte.

Where the government has failed to raise the prospect of harmless error, we enjoy a considerable degree of discretion in deciding whether to address that prospect.  See United States v. Samaniego, 187 F.3d 1222, 1224-26 (10th Cir. 1999) (declining to apply harmless error review where the government failed to raise the issue); United States v. Torrez-Ortega, 184 F.3d 1128, 1136-37 (10th Cir. 1999) (same); Lufkins v. Leapley, 965 F.2d 1477, 1481-82 (8th Cir. 1992) (applying harmless error review despite the government's failure to raise the issue).  In Samaniego and Torrez-Ortega, the respective panels considered three factors in deciding whether to apply harmless error review: "(1) the length and complexity of the record; (2) whether the harmlessness of the errors is certain or debatable; and (3) whether a reversal would result in protracted, costly, and futile proceedings in the district court."[4]  Samaniego, 187 F.3d at 1225; see also Torrez-

_____

[3]  At oral argument, when thrown the rope, the government assured us that it did favor application of harmless error review.

[4]  In Samaniego, 187 F.3d at 1225 n.2, we questioned the utility of the third factor (whether a reversal would result in protracted, costly, and futile

(continued...)

-12-

Ortega, 184 F.3d at 1136-37.

Here, the trial record is not extraordinarily complex. Mr. Sanders's trial involved a single defendant charged in a three-count indictment; the trial lasted three days. Nor is the outcome of the harmlessness inquiry, if undertaken, in serious doubt. As we explain below, that inquiry strongly suggests the harmlessness of the admission of Mr. Sanders's statements. Finally, a reversal would require a retrial. In light of these considerations, we elect to exercise our discretion to reach the harmlessness inquiry.

Because our case presents a constitutional error, see Mapp v. Ohio, 367 U.S. 643, 646-660 (1961) (applying the exclusionary rule to evidence admitted in a state case), we review Mr. Sanders's claim of error under the standard developed in Chapman v. California, 386 U.S. 18 (1967). Where the error is constitutional, Chapman requires that the government demonstrate that the error was "harmless beyond a reasonable doubt." Chapman, 386 U.S. at 24.

Here, Mr. Sanders's possession of the sawed-off rifle was an important element of both of his convictions. Certainly the improperly admitted statements suggested Mr. Sanders's possession of that firearm. Nevertheless, we are convinced "beyond a reasonable doubt" that the admission of the statements did

_____

[4](...continued)
proceedings in the district court).

-13-

not "contribute[] to the conviction" of Mr. Sanders. Id. The firearm, was, after-all, discovered inside Mr. Sanders's quonset hut. Even absent Mr. Sanders's statements, he could not have seriously contested his possession of the sawed-off rifle. Thus, we hold harmless the improper admission of Mr. Sanders's statements.

## B.    The Constitutionality of 18 U.S.C. § 922(g)(3)

Mr. Sanders next raises a due process challenge to 18 U.S.C. § 922(g)(3); Mr. Sanders argues that, as applied to his case, § 922(g)(3) is unconstitutional in that § 922(g)(3) requires an insufficient temporal nexus between drug use and firearm possession, thus leaving the statute unconstitutionally vague. Mr. Sanders insists that "the evidence at trial established no temporal proximity between Mr. Sanders['s] use of controlled substances and the possession of the firearms in question. Without a requirement of temporal proximity there is no limitation upon the statute, and [thus the statute] provides insufficient notice of what conduct is prohibited." Aplt's Br. at 28.

The government does not dispute that § 922(g)(3) may be void for vagueness in the absence of a sufficiently close temporal link between a defendant's drug use and firearm possession. The government does dispute Mr. Sanders's characterization of the evidence in his own case as insufficient to

establish such a temporal nexus.

Reviewing de novo Mr. Sanders's challenge to the constitutionality of § 922(g)(3), see United States v. Dorris, 236 F.3d 582, 584 (10th Cir. 2000) ("We review challenges to the constitutionality of a statute de novo."), we affirm the constitutionality of that statute as applied to Mr. Sanders's conduct.

Mr. Sanders is probably correct in asserting that 18 U.S.C. § 922(g)(3) is unconstitutionally vague in the absence of a judicially-created requirement of sufficient temporal nexus. See United States v. Reed, 114 F.3d 1067, 1071 (10th Cir. 1997) (reversing a district court's finding that § 922(g)(3) is, on its face, unconstitutionally vague but remanding for determination of whether § 922(g)(3) might well be unconstitutionally vague as applied in the instant case and thus to address "the [district court] judge's quite valid concern that the statute provides no time frame in which 'use' must occur in order for someone to be an unlawful user") (some internal quotation marks omitted). Nevertheless, Mr. Sanders is not correct to assert that his case is one of insufficient temporal nexus.

There is no direct evidence that Mr. Sanders was using drugs on May 26, 1999, the date the police discovered the sawed-off rifle. In fact, the evidence may suggest otherwise. See Rec. vol. IV, at 130-31 (trial test. of Officer Shavney) (answering "No" when asked whether, at the time of the May 26, 1999 search of Mr. Sanders's property, Mr. Sanders "appear[ed] to be under the influence of any

drugs"). The evidence does suggest that Mr. Sanders was a chronic drug user in the period <u>following</u> the discovery of the firearm, at least between July 26, 1999 and May 25, 2000. Further, Mr. Sanders was discovered in possession of methamphetamine on February 26, 1999, three months <u>prior</u> to the discovery of the sawed-off rifle. On March 1, 1999, Mr. Sanders admitted using methamphetamine and marijuana two weeks prior to that date. Finally, methamphetamine residue, marijuana, and various forms of drug paraphernalia were discovered in Mr. Sanders's residence <u>at the time of</u> the discovery of the firearm, May 26, 1999. This evidence, taken together, adequately demonstrates that Mr. Sanders used drugs in sufficient temporal proximity to his possession of one or more of the firearms discovered on his premises on May 26, 1999; § 922(g)(3), as applied to Mr. Sanders's case, is not unconstitutionally vague.

## C.    The Challenged Jury Instructions

Finally, Mr. Sanders argues that the district court erred in instructing the jury as to the charged violation of 18 U.S.C. § 922(g)(3). According to Mr. Sanders, the jury instructions given by the district court failed to require any temporal proximity between Mr. Sanders's drug use and his possession of the sawed-off rifle. The government does not dispute that the jury instructions should, indeed, have required at least some temporal connection between Mr.

Sanders's drug use and firearm possession. Rather, the government seems to argue that the jury instructions did include such a requirement.

"The question of whether the jury was properly instructed is a question of law" and is thus subject to de novo review. United States v. Voss, 82 F.3d 1521, 1529 (10th Cir. 1996). Jury instructions are, however, considered as a whole, with the reviewing court evaluating whether the jury, considering those instructions as a whole, was misled. See United States v. Mullins, 4 F.3d 898, 900 (10th Cir. 1993) ("The standard is not whether the instruction was faultless in every respect. Only where the reviewing court has substantial doubt that the jury was fairly guided will the judgment be disturbed.").

The jury instructions given in Mr. Sanders's trial, read carefully, require no temporal proximity between Mr. Sanders's drug use and firearm possession. While this failure does not mandate reversal if the jury instructions, taken as a whole, would nonetheless "fairly guide[]" the jury, Mullins, 4 F.3d at 900, here the jury instructions, read as a whole, cannot be said to "fairly guide" the jury. Thus we have error; nonetheless, on these facts, we find that error harmless.

The district court's jury instructions failed to require the jury to identify any temporal proximity between Mr. Sanders's drug use and possession of the sawed-off rifle. The instructions did require the jury to find that Mr. Sanders was a drug 'user' "during the time period charged." Aple's Br. at 50. At first glance,

then, the jury instructions appear to have included the element of temporal proximity. Unfortunately, however, the jury instructions defined 'user' as "one who regularly, at reoccurring times, unlawfully uses a controlled substance." Id. Given that definition, a defendant could acquire the status of a 'user' at the age of fifteen, forever halt the use of drugs at age sixteen, gain possession of a firearm at age sixty, and thus find him- or herself in violation of § 922(g)(3). That is, the defendant would retain the 'user' status while possessing a firearm. As the district court flatly confirmed, the government "need not prove the defendant actually illegally used a controlled substance at the same time he was in possession of the firearm." Id. at 51.

Given that the district court's jury instructions were infirm, the panel must ask whether, considering those jury instructions as a whole, the panel has "substantial doubt" that the district court failed to "fairly guide" the jury in evaluating the evidence. Mullins, 4 F.3d at 900. The district court provided four sentences explaining § 922(g)(3)'s requisite connection between firearm possession and status as a drug user. Reading those four sentences together leaves us with substantial doubt that the jury was fairly guided: the instructions fail to communicate the necessity of temporal proximity.

Finally, given the identification of trial error, we would ordinarily next consider the prospect of harmless error. Again, however, the government failed

-18-

to raise this issue during briefing.[5]  As noted above at Section II(A)(2), we may nevertheless choose to address the issue.  Since the trial record is not extraordinarily complex, the outcome of the harmless error inquiry as to the errant jury instructions is not in serious doubt, and a reversal would require a retrial, we elect to exercise our discretion to reach the harmlessness inquiry.  See United States v. Samaniego, 187 F.3d 1222, 1224-26 (10th Cir. 1999) (considering the three factors just identified); United States v. Torrez-Ortega, 184 F.3d 1128, 1136-37 (10th Cir. 1999) (same).

Because the given jury instructions removed the temporal proximity element of the § 922(g)(3) offense, and thereby probably rendered that offense unconstitutionally vague under our precedent, see United States v. Reed, 114 F.3d 1067, 1071 (10th Cir. 1997), we employ the Chapman v. California, 386 U.S. 18 (1967), standard of harmless error review.  Thus, as noted above, we inquire whether the given error is "harmless beyond a reasonable doubt."  Chapman, 386 U.S. at 24.

On these facts, we find the errant jury instructions harmless.  As noted in our discussion in Section II(B), above, the government introduced voluminous and uncontroverted testimony regarding Mr. Sanders's drug use before, after, and

---

[5]  At oral argument, the government assured us, again, that application of harmless error review would, in fact, be appropriate.

at the time of the discovery of the sawed-off rifle and other firearms in Mr. Sanders's trailer home and quonset hut. We are convinced, beyond a reasonable doubt, that the errant jury instructions did not contribute to Mr. Sanders's conviction. Any reasonable juror would have concluded that Mr. Sanders's drug use occurred in adequate temporal proximity to Mr. Sanders's possession of the sawed-off rifle.

### III. CONCLUSION

For the reasons set forth above, we AFFIRM Mr. Sanders's conviction and sentence.

Entered for the Court,


Robert H. Henry
Circuit Judge