FILED
United States Court of Appeals
Tenth Circuit

September 3, 2008

Elisabeth A. Shumaker
Clerk of Court

PUBLISH

**UNITED STATES COURT OF APPEALS**

**FOR THE TENTH CIRCUIT**

---

UNITED STATES OF AMERICA,

      Plaintiff-Appellee,

v.

JAMES LEE EDWARDS, JR., a.k.a.
Bear,

      Defendant-Appellant.

No. 07-6212

---

**APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF OKLAHOMA
(D.C. No. 06-CR-136-004-M)**

---

Bill Zuhdi, Oklahoma City, Oklahoma, for Defendant–Appellant.

Jonathon E. Boatman, Assistant United States Attorney (John C. Richter, United States Attorney, with him on the brief), Oklahoma City, Oklahoma, for Plaintiff–Appellee.

---

Before **O'BRIEN** and **McKAY**, Circuit Judges, and **BRIMMER**,[*] District Judge.

---

**McKAY**, Circuit Judge.

---

      Defendant was convicted of conspiracy to possess with intent to distribute

---

[*] The Honorable Clarence A. Brimmer, District Judge, United States District Court for the District of Wyoming, sitting by designation.

cocaine base, cocaine, marijuana, and ecstasy, as well as one count of possession with intent to distribute ecstasy and three firearm possession counts. He was sentenced to a 248-month term of imprisonment. On appeal, he challenges the sufficiency of the evidence supporting his convictions on all counts, the constitutionality as applied to him of the statute criminalizing firearm possession by drug users, certain evidentiary rulings made by the district court, and the district court's calculation of the advisory Sentencing Guidelines range.

## I. Sufficiency of the Evidence

We first address Defendant's argument regarding the sufficiency of the evidence, reviewing the record de novo to determine whether, "viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime[s] beyond a reasonable doubt." *United States v. McPhilomy*, 270 F.3d 1302, 1307 (10th Cir. 2001) (internal quotation marks omitted). We resolve any possible conflicts in the evidence in favor of the government and assume that the jury found that evidence credible. *United States v. Williamson*, 53 F.3d 1500, 1516 (10th Cir. 1995).

To prove the conspiracy count, the government was required to show (1) an agreement to violate the law, (2) Defendant's knowledge of at least the essential objectives of the conspiracy, (3) Defendant's knowing and voluntary involvement in the conspiracy, and (4) interdependence among the conspirators. *See United States v. Evans*, 970 F.2d 663, 668-71 (10th Cir. 1992). On appeal, Defendant

-2-

asserts that the government did not prove the third and fourth elements of the crime. However, we conclude that the government introduced ample evidence from which a rational trier of fact could have found these elements beyond a reasonable doubt.

According to the evidence introduced at trial, Defendant was a member of a street gang known as the Playboy Gangster Crips. Between June 2004 and July 2005, Defendant and fellow gang members were frequent visitors at an Oklahoma City residence rented by gang member Michael Maytubby and his girlfriend. Witnesses testified that Defendant regularly smoked marijuana at the residence. For instance, a daily visitor to the house testified that Defendant was usually smoking a marijuana blunt or "looking to get one" when he saw him. (Tr. at 302.) Another regular visitor testified that Defendant smoked marijuana like the witness smoked cigarettes, meaning a pack a day. A neighbor testified that Defendant would smoke marijuana every time he showed up at the house, and the jury was shown a video recorded by this neighbor in the fall of 2004, which showed Defendant smoking what appeared to be a marijuana blunt. Witnesses also testified that Defendant and other gang members occasionally used PCP at the residence.

In addition to using drugs, Defendant and other gang members sold drugs out of the house. Neighbors suspected, and visitors to the house confirmed, that drug deals regularly occurred at the house. One regular customer testified that he

usually dealt with Mr. Maytubby, but that sometimes when he knocked on the door, Defendant would answer and ask what he was looking for, then supply him with drugs if Mr. Maytubby was busy or away from the house. Another frequent visitor testified that crack, marijuana, and "pills of some sort" were available at the house. (Tr. at 449.) Gang members stopped by police in the vicinity of the residence on various occasions were found in possession of marijuana, crack cocaine, individually wrapped ecstasy pills, and large amounts of cash. Two witnesses testified that Defendant and other gang members pooled their money to buy powder cocaine, which Mr. Maytubby then cooked into crack for the members to distribute. An expert witness testified that pooling money in this way allows drug-trafficking gangs to receive a bulk discount on their cocaine purchases.

Witnesses also testified that the gang members were regularly in possession of guns. For instance, one regular visitor to the house testified that all of the gang members usually had firearms on them in the house and often left firearms lying around the house as well. According to an expert witness, a drug-trafficking gang based out of a particular residence will commonly keep a set of business guns for the gang members' common use. Several gang members were also found in possession of firearms by law enforcement officers on various occasions during the course of the conspiracy. For instance, Defendant was stopped by police on November 30, 2004, after leading police on a vehicular

chase through residential neighborhoods. The subsequent search of his vehicle revealed a loaded handgun on the floor under the driver's seat. This handgun had previously been reported stolen by its legal owner.

Moreover, the government introduced evidence suggesting that Defendant and his fellow gang members used guns to protect or to further their drug-trafficking operation. An expert testified at trial that street drug gangs will often control a particular area and that they may engage in violent fights if a rival gang attempts to encroach on their territory. The jury also heard testimony regarding a violent gunfight that occurred on the street in front of Mr. Maytubby's residence. On the night of October 17, 2004, residents of the neighborhood were disturbed by the prolonged sound of gunshots, as several individuals exchanged extensive gunfire down the street. One neighbor later testified that he recognized Defendant, Mr. Maytubby, and another gang member as three of the persons involved in the shootout.[1] The police received around thirty-five 9-1-1 calls regarding the shooting. When they arrived, they saw that "pretty much [the] whole block" was full of shell casings (R. at 551). Stray bullets had caused

---

[1] Defendant argues that we should disregard this testimony because it was impeached by an officer's testimony that the neighbor reported on the night of the shootout that he did not know who was involved in the shooting. However, we take the evidence in the light most favorable to the government and "do not weigh conflicting evidence or consider witness credibility, as that duty is delegated exclusively to the jury." *United States v. Castorena-Jaime*, 285 F.3d 916, 933 (10th Cir. 2002).

extensive damage throughout the neighborhood.

The officers who approached Mr. Maytubby's residence saw that the glass storm door had apparently been shattered by a bullet. However, the closed door behind the storm door had no holes in it, suggesting that it had been open during the shooting. Shortly after the police knocked on the front door, it was opened by Mr. Maytubby. In response to the officers' queries, he reported that he had been asleep and did not know who was inside his residence. The police noticed a shell casing just inside of the house, by Mr. Maytubby's feet. They then entered the house, where they found Defendant and two other gang members sitting upright on couches in the den, fully clothed, wearing winter coats, and pretending to be asleep. The officers also found a rifle, shell casings, boxes of ammunition, digital scales, marijuana, and ecstasy in the residence.

The government also presented other evidence suggesting that members of the gang worked to protect the gang's drug-trafficking efforts and prevent interference by law enforcement officers. For instance, a neighbor testified that he and his wife were confronted and threatened by Defendant and other gang members after they found out that he had recorded a video of their activities and given this video to the police. This neighbor further testified that Defendant "acted like he was the muscle, the tough guy over there [at the house]." (Tr. at 64.) Another neighbor testified that Defendant was present when a fellow gang member threatened to kill her and her children because neighbors had called the

police about the shootout. The government also presented evidence suggesting that Defendant at least occasionally guarded the door to the residence to ensure that only known individuals were allowed inside.

We thus conclude that the government presented ample evidence from which a rational trier of fact could conclude that Defendant was knowingly and voluntarily involved in this drug-distribution conspiracy both as a distributor and as the "muscle." We further find ample evidence supporting a conclusion that the coconspirators were interdependent, given the evidence that they pooled their money together to purchase drugs, referred clients to one another, and worked together to oppose any threats to their drug-trafficking operation.

Defendant's second count of conviction was for possession of ecstasy with intent to distribute or for aiding and abetting the same. This count stems from twenty ecstasy pills found in a bedroom in Mr. Maytubby's residence on the night of the shootout. Specifically, the pills were found in a rifle case located in a closet in Mr. Maytubby's bedroom. Given this location and the lack of specific evidence tying him to ecstasy possession or distribution, Defendant argues that he cannot be found to have possessed the ecstasy at issue. However, we conclude that ample evidence supports Defendant's conviction on this count.

The government presented evidence that Defendant regularly dealt drugs out of Mr. Maytubby's house, which was the base of a large-scale drug-trafficking operation involving ecstasy, crack, and marijuana. A regular visitor to the house

testified that Defendant had access to the bedroom where the ecstasy pills were found and that close associates knew that guns, drugs, and money were kept in that bedroom. The government presented evidence from which the jury could reasonably conclude that Defendant carried a gun around the house, guarded the front door, asked potential customers what they were looking for, and engaged in a shootout to protect or further his gang's drug-trafficking efforts. At a minimum, the evidence supported a conclusion that Defendant aided and abetted Mr. Maytubby's possession of the ecstasy. The jury also heard evidence supporting a finding of intent to distribute, including testimony that the number of pills found was a distributable quantity and that a person keeping ecstasy only for personal use would rarely be in possession of more than four or five pills at one time. We thus reject Defendant's sufficiency challenge as to this count.

Defendant's three firearm possession counts consisted of one count of possessing a firearm in furtherance of a drug-trafficking crime, based on a silver rifle found in Mr. Maytubby's residence on October 17, the night of the shootout, and two counts of possessing a firearm as a user of controlled substances. Of the two user-in-possession counts, one was based on the silver rifle, while the other was based on the handgun found in Defendant's vehicle on November 30, 2004. Defendant argues that the government introduced insufficient evidence to prove that he possessed the silver rifle because it, like the twenty ecstasy pills discussed above, was located in Mr. Maytubby's bedroom. He also argues that the

government did not prove that he was a user of controlled substances at the time he was in possession of the rifle on October 17 and the handgun on November 30.

We conclude that the government introduced sufficient evidence for a reasonable jury to conclude that Defendant possessed the silver rifle on October 17, 2004. The jury heard testimony that Defendant was seen shooting a silver rifle on that night and that a silver rifle was later found in the house where Defendant was pretending to be asleep.[2] The jury heard testimony that Defendant sometimes entered and exited Mr. Maytubby's bedroom while carrying firearms. The jury heard testimony that street gangs sometimes engage in violent fights with other gangs to protect or expand their drug turf and that drug-trafficking gangs often keep a common stash of guns at their base of operations for all members to use as necessary. Taken in the light most favorable to the government, the evidence introduced at trial supports the jury's finding that Defendant possessed the silver rifle on October 17, 2004.

Given the close proximity between firearms and drugs throughout the conspiracy, including the night of October 17, 2004, we also find sufficient

---

[2] Defendant contests the credibility of this testimony, but we do not weigh credibility in our review of the sufficiency of the evidence. Defendant also argues that the silver rifle found in the house could not have been used in the shootout because none of the more than fifty shell casings recovered by the police matched to the rifle. However, we note that several neighbors testified that they found casings or bullets that the police had missed. Thus, the jury could quite reasonably have concluded that Defendant fired the silver rifle during the shootout, despite the lack of ballistic evidence.

evidence to support a conclusion that the firearm was possessed in furtherance of a drug-trafficking crime. Indeed, the jury could reasonably have concluded that Defendant himself fired the silver rifle at members of a rival gang in order to further his gang's drug-trafficking conspiracy. We thus see ample evidence supporting Defendant's conviction for possessing a firearm in furtherance of a drug-trafficking crime on October 17, 2004.

We reject Defendant's contention that the government presented insufficient evidence that he was a user of controlled substances on the dates alleged in the two user-in-possession counts. While it is true that the government did not introduce specific, direct evidence pinpointing precise dates on which Defendant used drugs, the evidence introduced at trial supported a reasonable inference that Defendant was a user of controlled substances during all relevant times. Several witnesses testified that Defendant was a habitual, heavy user of marijuana at the time the conspiracy was in effect, and none of the witnesses indicated that Defendant's drug usage changed or varied over the year of the conspiracy, which lasted from June 2004 to July 2005. We conclude that the jury could reasonably have taken the witnesses' testimony regarding Defendant's consistent, heavy drug use to refer to the entire time period of the conspiracy. Moreover, the jury could reasonably have concluded that the substance Defendant was seen smoking in video footage from the fall of 2004 was marijuana, further supporting a conclusion that Defendant was a drug user during this time period.

We thus conclude that the government introduced sufficient evidence to support a finding that Defendant was a user of controlled substances in possession of a firearm in October and November 2004.

## II.  Constitutional Challenge

For similar reasons, we reject Defendant's as-applied constitutional challenge to the statute criminalizing firearm possession by drug users.  Such a challenge will fail where the government has introduced sufficient evidence of a temporal nexus between the drug use and firearm possession.  *See United States v. Sanders*, 43 F. App'x 249, 256 (10th Cir. 2002) (rejecting as-applied challenge to statute where government introduced evidence that defendant used and possessed drugs three months prior to discovery of firearm in his residence, police found marijuana and drug paraphernalia in his residence at the time firearm was discovered, and he was chronic drug user in months following the firearm's discovery).  Given the ample evidence of Defendant's heavy, habitual drug use in the year during which he possessed the firearms at issue, we conclude that the statute was not unconstitutionally vague as applied to him.

## III.  Evidentiary Rulings

Defendant also challenges certain evidentiary rulings made by the district court.  Specifically, Defendant argues that the court erred in allowing the prosecution to introduce five recordings of 9-1-1 calls made on the night of the shootout and testimony regarding Defendant's two prior convictions for marijuana

and cocaine possession. We review for abuse of discretion the district court's admission of this evidence over Defendant's objections. *See United States v. Green*, 175 F.3d 822, 833 (10th Cir. 1999).

Defendant argues that the 9-1-1 recordings were cumulative and that the probative value of this evidence was substantially outweighed by the danger of unfair prejudice. We disagree. The recorded calls were quite short, and the government played only five of the approximately thirty-five calls that had been recorded. These calls from various neighbors documented the shootout and tended to show, inter alia, that Defendant and his fellow gang members had not slept through the shootout as they appeared to be pretending when the police arrived. Nothing in the record before us convinces us that these calls should have been excluded as cumulative nor that they were so unfairly prejudicial as to substantially outweigh their probative value. We thus conclude that the district court did not abuse its discretion in admitting the calls.

We find more problematic the court's admission of evidence regarding Defendant's previous drug convictions. Over Defendant's objection, the court allowed the government to introduce evidence that Defendant had a prior felony conviction for possessing a small amount of cocaine in July 2002 and a prior misdemeanor conviction for possessing marijuana in August 2002. According to evidence in the record, both prior convictions involved the discovery of small, personal-user amounts of drugs in Defendant's vehicle during two different traffic

stops. In arguing before the district court that this evidence was admissible, the government simply asserted without explanation or analysis that the convictions were being offered "to prove the defendant's intent in the current case, to prove his knowledge, to prove his motive in this case, to prove that there was no mistake or accident, and to corroborate the testimony of several other witnesses who will testify at trial to seeing the defendant possess and sell cocaine and possess, sell, and use marijuana." (R. Doc. 335 at 3-4.) The district court did not require the government to clarify how the evidence was relevant for these purported purposes, but merely noted the proffered purposes and held that the evidence was offered for a proper purpose, that it was relevant, and that the probative value was not substantially outweighed by its potential for unfair prejudice.

On appeal, the government again asserts with little explanation that the evidence was obviously relevant for all of these purposes. We find the government's unsupported assertions troubling. We note, for instance, that the government asserted before the district court and maintains on appeal that the evidence was relevant to show absence of mistake or accident. However, lack of mistake was never an issue at this case—Defendant never asserted that he was unaware of the nature of the substances at issue but simply argued that he was not personally involved in the distribution or possession for distribution of these substances. Likewise, we are unable to discern how evidence that Defendant

possessed personal-usage amounts of controlled substances is relevant to show that he intended to distribute narcotics in the instant case. *Cf. United States v. Cherry*, 433 F.3d 698, 702 (10th Cir. 2005) (holding that evidence of prior conviction for "knowing distribution" was relevant to show specific intent to distribute in charged offense). Although the government correctly points out that we have held that corroboration may be a valid reason for the admission of prior acts evidence, *see United States v. Porter*, 881 F.2d 878, 886 & n.8 (10th Cir. 1989), we conclude that the disputed evidence in this case was not relevant for any permissible corroborative purposes. Evidence of Defendant's prior possession of personal-user amounts of drugs did not corroborate witnesses' testimony regarding distribution, and it could only corroborate witnesses' testimony of current drug possession through an impermissible propensity argument.

Moreover, we note that the prior convictions in this case did not involve factually similar conduct. As in *United States v. Wilson*, 107 F.3d 774, 785 (10th Cir. 1997), Defendant's prior convictions for possessing a small amount of drugs in his vehicle "does little to support an inference that [he] either possessed, knew he possessed, or intended to distribute the [drugs] found at" the residence at issue. *See also United States v. Becker*, 230 F.3d 1224, 1232 (10th Cir. 2000) (finding evidence of prior conviction for conspiracy to possess methamphetamine not relevant to charges of manufacturing methamphetamine and possessing marijuana

-14-

with intent to distribute because prior acts lacked facial similarities to the charged offense). We conclude that the evidence of Defendant's prior drug possession was not relevant in this distribution case, and we thus hold that the court abused its discretion by admitting this evidence.

However, "[w]here the evidence against a defendant is overwhelming, any error in mentioning a defendant's criminal record is harmless." *United States v. Sloan*, 65 F.3d 861, 865 (10th Cir. 1995). As described above, the government introduced extensive evidence of Defendant's involvement in this large-scale drug-trafficking operation, his heavy, habitual, drug use, and his involvement with firearms. In light of the overwhelming evidence against Defendant that was properly admitted at trial, we hold that the minimal evidence of his two prior drug possession convictions did not substantially influence the outcome of his trial. *See Becker*, 230 F.3d at 1233. We thus conclude that the court's error in admitting this evidence was harmless. Because we see no other errors in the court's decisions at trial, we likewise reject Defendant's cumulative error argument. *See Workman v. Mullin*, 342 F.3d 1100, 1116 (10th Cir. 2003) (noting that cumulative error analysis requires at least two errors).

## IV. Sentencing

Finally, Defendant argues that the district court erred in calculating the applicable Guidelines range for his sentence. Specifically, Defendant argues that the court should not have applied two criminal history points for two convictions

with deferred sentences because neither conviction involved a term of imprisonment. Reviewing this legal issue de novo, *see United States v. Tom*, 494 F.3d 1277, 1281 (10th Cir. 2007), we conclude that the district court did not err in applying these criminal history points. These points were assessed under § 4A1.1(c) of the Guidelines. Unlike subsections (a) and (b) of § 4A1.1, subsection (c) is not limited to sentences of imprisonment. Indeed, the commentary to the Guidelines specifically states that a diversionary disposition qualifies as a prior sentence under this subsection "where there is a finding or admission of guilt in a judicial proceeding." U.S.S.G. § 4A1.1 cmt. n.3. Defendant does not contest the government's assertion that both of the convictions at issue were diversionary dispositions involving an admission of guilt in a judicial proceeding. We thus reject Defendant's contention that the court erred in assessing criminal history points pursuant to § 4A1.1(c) for these convictions.

For the foregoing reasons, we **AFFIRM** Defendant's conviction and sentence.